UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOHEIL ZAERPOUR & THE PEOPLE OF
THE UNITED STATES,

Plaintiffs,

*vs.*

JP MORGAN CHASE BANK, BANK OF
AMERICA, UBS, CREDIT SUISSE,
CITIBANK, HSBC, GOLDMAN SACHS,
DEUTSCHE BANK, ROYAL BANK OF
SCOTLAND, ET AL.,

Defendants.

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

**21-cv-09680**

## INTRODUCTION

Plaintiff, Soheil Zaerpour, requests that the Court deny the Defendants' motion to dismiss. In the alternative, Plaintiff requests that the Court grant Plaintiff leave to amend Plaintiff's complaint to address any deficiencies identified by the Court. *Nielsen*, 746 F.3d at 62. ("Generally, leave to amend should be freely given, and a pro se litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim. A pro se complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.") (internal quotation marks and citation omitted).

In construing Plaintiff's response, Plaintiff asks that the Court read any new additional facts asserted in this opposition brief as supplementing the operative complaint, as the Court may do with pro se litigants. *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (overturning the district court's grant of dismissal where the complaint and opposition papers to a motion to dismiss when combined stated a claim upon which relief could be granted).

1

## ARGUMENT

Here, the defendants have raised various arguments against the causes of action Plaintiff alleged under federal and state law. Plaintiff asks the Court to construe the complaint liberally in considering its ruling. Plaintiff does not intend to waive or forfeit any of Plaintiff's causes of action.

## I.    PLAINTIFF HAS PROPERLY EFFECTED SERVICE ON ALL DEFENDANTS

New ECF Rules 9.1 and 9.2 Regarding Service of Documents by Filing on the Electronic Case Filing (ECF) System states that this process for docketing on ECF is deemed to be service under Rule 5(b) of the Federal Rules of Civil Procedure.[1] The legal entities' names of the defendants have been amended in the plaintiff's declaration filed on January 4th, 2022 already (ECF no. 50, section 3). An amended complaint will be filed incorporating these corrections upon the Court's request.[2]

## II.   PLAINTIFF'S CLAIMS ARE TIMELY

Plaintiff did not know the identities of the defendants precisely because of

FRAUDULENT CONCEALMENT (Key word here is "precisely"). To note, the press

---

[1] https://www.nysd.uscourts.gov/prose
[2] Plaintiff's information  regarding the exact identities of the defendants is based on publicly available sources and analysis thereof, including: publicly available press releases, news articles, and other media reports.

release in 2006 referenced a "shadowy world power" (EFC no. 54-2). See also Zaerpour v. FBI, EFC no. 8:  "I do not know the identity of the criminals […] "the financial markets are anonymous to me" .." I was expecting the F.B.I to help me obtain some answers so that I can file complaint in Court" (2014).  The spyware (see attached exhibit) was reported to the FBI the same year as discovery (as per statute of limitation).

In 2017, plaintiff filed similar Complaint with the New Jersey Superior Court which was dismissed "without prejudice" because plaintiff could not provide the name of the defendant and "because of lack of prosecution" (Zaerpour v. Unknown, PAS L-3843-17).

In fact, the European Commission's own FOREX manipulation's probe was concluded AFTER the filing of this complaint with NYSDC in Dec. 2021.[3] For the rest plaintiff respectfully refers the Court to the declaration filed on January 4th, 2022 (ECF no. 50, section 3).

Below is the excerpt from attached complaint in Allianz Global Investors GMBH et al. v. Bank of America Corp. et al. NYSDC Case 1:18-cv-10364, pp 215-218[4]:


EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO

DEFENDANTS' CONCEALMENT OF THE CONSPIRACY TO MANIPULATE

---

[3] https://www.swissinfo.ch/eng/swiss-banks-implicated-in-trading-cartel-investigation/47160018
[4] Bloomberg' article reports front-running of customers by the large banks, which does not apply to the plaintiff however.

FX PRICES, BENCHMARKS, AND BID/ASK SPREADS

"Defendants actively, fraudulently, and effectively concealed their collusion, as

alleged herein, from Plaintiffs and other investors.

Due to Defendants' efforts to conceal their collusive conduct, and their campaign

to avoid its detection, Plaintiffs could not, through the exercise of reasonable diligence,

have learned of facts indicating that Defendants were colluding to manipulate prices,

benchmark rates, and bid/ask spreads in the market prior to June 12, 2013, when

Bloomberg first reported of the possibility that Defendants were rigging currency rates.

In fact, Plaintiffs were not on notice based solely on the contents of the June 12, 2013

Bloomberg article, but rather not until later, when government actions revealed

previously concealed evidence of Defendants' conspiracy to manipulate the FX market.

As a result of Defendants' fraudulent concealment, all applicable statutes of limitations

affecting Plaintiffs' claims have been tolled."

Defendants' conspiracy was by its nature secretive and self-concealing. Defendants

used non-public methods of communication, such as private chatrooms and text

messages, to conceal their agreements to manipulate FX prices. The chatrooms were

operated by high-ranking traders, and Defendants strictly limited access to the

chatrooms. Defendants often agreed, in the chatrooms, to not publically discuss or

otherwise reveal the nature and substance of the chats. The substance of the

conversations in the chatrooms was unknown to Plaintiffs until government actions

revealed previously concealed evidence of Defendants' conspiracy to manipulate FX

benchmark rates. Even then, it was not until the entry of guilty pleas by four

Defendants on May 20, 2015, that evidence of collusion to manipulate bid/ask spreads

was publically available.

Defendants actively and jointly undertook trading strategies designed to conceal

their collusive conduct, such as "painting the screen" or executing phony transactions,

so that even diligent investors could not detect Defendants' manipulation of exchange

rates.

Defendants also used false pretenses to collude, executing agreements to rig FX

prices while operating under the guise of legitimate corporate communications. For

instance, as alleged above, Defendants were members of the Bank of England's

London Foreign Exchange Joint Standing Committee, and using the cover of their

membership, as part of the chief dealers' subgroup, Defendants met and reached

agreements to manipulate the prices. These meetings concerned trading strategies that

were in no way connected to legitimate work of the subgroup.

When concerns were privately raised at a Bank of England meeting over possible

manipulation for WM/Reuters Closing Rates, according to chatroom transcripts

reviewed by people that spoke with Bloomberg, the Defendants acted jointly and

through chatrooms to disguise their conduct.

While regulators such as the United Kingdom Financial Conduct Authority, the

U.S. Department of Justice criminal and antitrust divisions, the U.S. Commodity Futures Trading Commission, the U.S. Federal Reserve, the New York Attorney General's Office, the Office of the Comptroller of the Currency, the Swiss Financial Market Supervisory Authority, the Swiss Singapore, and the Dutch regulator AFM have all opened investigations, all of these investigations commenced after the publication of the initial Bloomberg article in June 2013.

Even when Bloomberg first reported collusion among the Defendants using chatrooms and instant messaging services, Defendants did not break ranks, but instead engaged in ongoing efforts to keep their collusion hidden. In response to inquiries from the reporter, the banks refused to comment and offered phony justifications for their communications.

Throughout the relevant period, Plaintiffs regularly monitored their investments

and conducted due diligence to try to avoid being harmed by financial misconduct. Practically speaking, there were limits to what could be done, given that so much of the foreign exchange market was shrouded in secrecy due to Defendants' conduct.

Reasonable due diligence could not have uncovered Defendants' conspiracy

because (1) Defendants' trades and trading strategies are not public information; and (2) the bilateral, non-exchange traded nature of the spot trades further obscures what Defendants were, and are, doing at any particular time.

As a result of the self-concealing nature of the price-fixing conspiracy, the active

steps taken by Defendants to fraudulently conceal their conspiracy and the lack of public information concerning material aspects of the conspiracy, the statute of limitations was tolled for Plaintiffs' claims.

The first of many antitrust class action suits on behalf of those who engaged in

FX transactions was filed on November 1, 2013. Plaintiffs were originally included in the

defined class in many of the antitrust class actions, which asserted the same causes of action, against the same Defendants, as are named in this Complaint. Plaintiffs reasonably and justifiably relied on the named plaintiffs in the FX class actions to protect their rights, and they competition authority WEKO, the Hong Kong Monetary Authority, the Monetary Authority of Singapore, and the Dutch regulator AFM have all opened investigations, all of these investigations commenced after the publication of the initial Bloomberg article in June 2013.


As a result of the self-concealing nature of the price-fixing conspiracy, the active

steps taken by Defendants to fraudulently conceal their conspiracy and the lack of public information concerning material aspects of the conspiracy, the statute of limitations was tolled for Plaintiffs' claims.

The first of many antitrust class action suits on behalf of those who engaged in

FX transactions was filed on November 1, 2013. Plaintiffs were originally included in the

defined class in many of the antitrust class actions, which asserted the same causes of

action, against the same Defendants, as are named in this Complaint. Plaintiffs

reasonably and justifiably relied on the named plaintiffs in the FX class actions to

protect their rights, and they reasonably and justifiably relied on the class-action

doctrine articulated in American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974),

and other similarly applicable doctrines, to satisfy the statutes of limitations on their

claims. Under American Pipe, all proposed class members are treated as if they filed

their own individual actions, until they either opt out or a certification decision excludes

them. American Pipe, 414 U.S. at 255. Accordingly, the claims here are deemed to

have been brought as of the date they or similar claims were brought in the

related class actions, and therefore the FX class actions tolled Plaintiffs' claims." [5]

In terms of "opportunity costs", plaintiff still cannot trade FOREX freely as the equal

protection under the Constitution he is entitled to is not respected by the FBI (e.g.

spyware incident despite up-to-date virus protection).[6] See ECF no. 54-1, p.4/ Zaerpour

v. FBI, NJD-2:13-cv-06073-ES-JAD, p.3, lines 6-10. This case is further ongoing for the

plaintiff's and has morphed into his commercial aviation training interruption by no fault

of his own and despite plaintiff meeting ALL the FAA standards and requirements as

documented in his aviation logbook.

---

[5] Allianz Global Investors GMBH et al. v. Bank of America Corp. et al. NYSDC Case 1:18-cv-10364, EFC no. 1, pp 215-218.

[6] https://ww1.prweb.com/prfiles/2011/04/11/449517/IllegalOnlineSurveillance.bmp

### III.     PLAINTIFF HAS STANDING TO PURSUE ANTITRUST CLAIMS

Plaintiff has been the <u>DIRECT</u> target of this alleged banking cartel, continuously for years (Compl. p.1, lines 13-16) and suffered as a direct result of the cartel's monopolistic behaviour as the Interbank forex rates are set by the defendants collectively[7]. The fact that plaintiff was an "indirect purchaser" of FX instruments is irrelevant in this regard. In addition, plaintiff is alleging damages consequent to the cartel's behaviour in the forex market reported by other Forex litigants:

> "BY COLLUDING TO MANIPULATE FX PRICES, BENCHMARKS, AND BID/ASK SPREADS, DEFENDANTS RESTRAINED TRADE, DECREASED COMPETITION, AND ARTIFICIALLY INCREASED PRICES, THEREBY INJURING PLAINTIFFS."[8]

Plaintiff is entitled to <u>treble damages</u> for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act. Moreover the damages reported by the defendants in their joint-memorandum are on-par with the crime committed and can be verified by inputting into a forex compounding calculator plaintiff's numbers as reported in the complaint under "damages" (Compl. p. 13, lines 194-197). This does not yet account for damages to the people of the United States as reported in the complaint.

---

[7] https://www.investopedia.com/articles/forex/06/interbank.asp
[8] Allianz Global Investors GMBH et al. v. Bank of America Corp. et al. NYSDC Case 1:18-cv-10364, EFC no. 1, p. 211.

To-date, defendants have not provided ANY counter-arguments as to why this number might be erroneous (or exaggerated).

## IV.    PLAINTIFF SUCCESSFULLY PLEADS FACTS SUPPORTING A PLAUSIBLE INFERENCE OF AN ANTITRUST CONSPIRACY

Plaintiff's facts as reported in this case are undisputed by the FBI. Plaintiff has provided the statistical independent legal proof already (ECF no. 50-1). According to Euromoney's survey and New York-FED's list of FOREX counterparties, all the defendants cited are part of the largest forex dealers globally.[9] As of 2019, the daily volume of FOREX was 6.6 trillion.[10] Plaintiff's damages are a DIRECT consequence of the cartel's behaviour and conspiracy against him (Compl. P. 13, lines 182-184 & ECF no. 50-1, p.66)  The statistical causality is UNDISPUTABLE and undisputed by the FBI and the Judge in court (Compl. p.2., line 29 & p. 3, lines 34-36 & p. 12, lines 179-181 & Zaerpour v. FBI. NJD-2:13-cv-06073, Compl. P. 5, lines 17-21).

The fact that the defendants seem not to understand the graphs attached to the complaint and make erroneous statements is irrelevant (ECF no. 53, p.8). In plaintiff's view, only an independent, competent and transparent expert review of the recorded legal account statements can remedy this situation for the Court which can only happen during the discovery process (See attached FAQ document). Suffice to say that

---

[9] https://www.newyorkfed.org/markets/counterparties/foreign-exchange-counterparties
[10] https://www.bis.org/statistics/rpfx19_fx.htm

plaintiff's trades were <u>predictive</u> of FX movements <u>all the time</u> which is absolutely

<u>extraordinary</u> (IMPOSSIBLE in terms of probability) unless there is a conspiracy against

the plaintiff, as alleged in the complaint and recorded in the independent legal account

statements (Compl. pp 12-13, lines 179-184 & ECF no. 50-1).

Misrepresenting or misunderstanding the facts repeatedly by the defendants, as done in

their joint-memorandum of law, leads to misapplying legal cases and the law, and

misapplying legal cases and the law in turn leads to a wrong and absurd conclusion at

the end (ECF no. 53, p. 21).

Plaintiff is not asking the Court to listen to the plaintiff but to listen to the fact as

recorded in his legal independent statements and the science.


### V.    PLAINTIFF'S ANTITRUST CLAIMS ARE NOT EXTRA-TERRITORIAL


The fact that plaintiff's address appears in Switzerland (a P.O. Box) in one of his

account is a MISTAKE made by his broker because of the use of a Swiss credit card to

make deposit at one time. The address on record was in the US, always. Plaintiff has

lived in New Jersey permanently since 2000 (EFC no. 50-3).

The *location* of the financial assets held is irrelevant. Securities are immaterial objects.

What matters is that FOREX rates are used daily to value those assets for US investors

and pensioners.[11] The damage occurred in the United States.  Same holds true for

ADRs (American Deposit Receipts) which are Foreign stocks held abroad by banks on

behalf of US persons in the United States.[12]


## VI.   PLAINTIFF SUCCESSFULLY PLEADS CONSTITUTIONAL TORT CLAIMS


Tort claims cited in the cause of action refer the police and FBI's alleged infractions

(Compl. p. 13, lines 185-187), and alleged the obstruction of justice  by the banking

cartel thereof (Compl. P.14, lines 217-218). To note, the chief of police in Clifton/NJ, the

FBI director and his deputy in charge of the forex probe have since been fired for

unrelated charges.[13]


## VII.   PLAINTIFF HAS STANDING TO ASSERT VIOLATIONS OF CRIMINAL LAWS


Spyware installation is a computer crime. Illegal surveillance of communications is

another crime. Depravation of civil rights is yet another crime (Compl. P.14, lines 200-

203). Denying world peace is a national security crime as is manipulation of the United

---

[11] https://www.investopedia.com/terms/a/adr.asp

[12] https://www.investopedia.com/terms/a/adr.asp

[13] https://www.npr.org/2021/10/14/1039690679/andrew-mccabe-lawsuit-trump-fbi

States' currency (Compl. P. 14, lines 214-216 & line 207).  National security crimes

punishable by death are imprescriptible.[14]


### VIII.   THE COURT SHOULD NOT DISMISS ALL ALLEGATIONS SUGGESTING PLAINTIFF IS SEEKING TO PROCEED ON BEHALF OF A CLASS


Plaintiff has demonstrated that by manipulating FX rates against him, substantial

damages has been done to U.S. consumers in general through their investments

because FX rates are UNIQUE globally and used to value their investments daily

(Compl. p. 5, lines 42-44). Financial damages to US consumers, investors or

pensioners is up to **100 times greater*** than previously reported by the DOJ,

mathematically speaking. (Compl. p. 5, line 46). As such this unique evidence can be

used by other parties in Court in putative Class Actions. This does not account for the

loss of life or injuries relating to World Peace or other damages to the United States

(and world) citizens (Compl. p.2, lines 15-16 & p. 3, lines 32-33)


### IX.   THE COURT SHOULD NOT DISMISS PLAINTIFF'S CLAIMS AGAINST ROYAL BANK OF SCOTLAND AS PERSONAL JURISDICTION EXISTS


RBS/NatWest's  main location is irrelevant since they trade in US dollars in significant

manner. As such, RBS/NatWest is listed as a "Forex counter-party" of the New York-

---

[14] https://fas.org/sgp/crs/misc/RL31253.pdf

FED among a handful of big banks.[15] In the US, RBS/NatWest is under the jurisdiction of the Comptroller of the Currency (within the US Treasury) which serves to charter, regulate and supervise all national banks and the federally licensed branches and agencies of foreign banks in the United States.[16] RBS has already been convicted of FX market manipulation along with some other large banks by the EU Commission, DOJ, CFTC, the FED and FCA.[17][18][19][20]

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the motion to dismiss.

In the alternative, Plaintiff requests that the Court grant Plaintiff leave to amend Plaintiff's complaint to address any deficiencies identified by the Court, and any other relief this Court deems just and proper.

Dated: February 16, 2022                              /s/ Soheil Zaerpour

---

[15] https://www.newyorkfed.org/markets/counterparties/foreign-exchange-counterparties
[16] https://scholarship.law.bu.edu/faculty_scholarship/265
[17] https://www.cnbc.com/2021/12/02/barclays-rbs-hsbc-credit-suisse-ubs-fined-for-forex-trading-cartel.html
[18] https://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas
[19] https://web.archive.org/web/20141113150820/https://www.cftc.gov/PressRoom/PressReleases/pr7056-14
[20] https://www.fca.org.uk/news/press-releases/fca-fines-five-banks-%C2%A311-billion-fx-failings-and-announces-industry-wide-remediation-programme

Soheil Zaerpour

16-C Thornton Pl.

Clifton, NJ 07012

Tel. (862) 668-4036

Soheil.Zaerpour@Njwg.Cap..Gov